[Crim. No. 435.   Third Appellate District.—September 24, 1918.]

THE PEOPLE, Respondent, v. · FONG SING, Appellant.

EVIDENCE—HEARSAY—RES GESTAE—WHAT ADMISSIBLE AS.—Under the doctrine of *res gestae,* evidence is admissible of extra judicial declarations, tending to explain or show the character, motive, or purpose or intent of a transaction, itself in dispute, which, under other or ordinary circumstances, would be excluded as hearsay or self-serving.

ID.—LIMITATION ON RULE.—Since the rule relating to *res gestae* constitutes an exception to the general rule excluding hearsay, it must be confined in its application strictly to the circumstances or conditions giving rise to the reasons for the recognition of that class of testimony as a legal method of proving a fact.

CRIMINAL LAW—MURDER—DEFENSE OF ALIBI—EXCLUSION OF DECLARATION OF DEFENDANT.—In a prosecution for murder, where the defendant relied upon an *alibi* as a defense, the exclusion of evidence of a declaration of the defendant, a Chinese, of his intention of going to a certain place, although such evidence was admissible under the rule of *res gestae,* did not warrant the reversal of a judgment of conviction in view of section 4½ of article VI of the constitution, when the appellate tribunal could not perceive how the excluded testimony could have added any more support to the *alibi* theory than it derived from the testimony of an unimpeached white witness whose testimony had been received.

ID.—WITNESS FOR DEFENDANT—CONDUCTING UNLAWFUL BUSINESS—CROSS-EXAMINATION UNPREJUDICIAL.—Where a witness for the defendant in such case had testified on his direct examination that he was conducting a laundry, cross-examination as to whether he had ever conducted a lottery business was not ground for objection in an appellate court, especially in view of the fact that no objection to the first question on that line of cross-examination was made at the trial, and that later an objection to the last question on the same line was sustained, and it appearing, moreover, that the de-

fendant was not prejudiced, since the witness had denied positively that he had ever conducted a lottery business.

ID.—Receiving Evidence Out of Court—Newspaper Publication of Rumors—Motion for New Trial.—The trial court did not err in denying a motion for a new trial made on the ground that the jury received evidence out of court, where the affidavit of the defendant in support of the motion stated on his "information and belief" that the jury heard and took notice of a common rumor published in a newspaper and read newspaper articles to the effect that the defendant intended to plead guilty, but there was no positive showing that the jurors or any of them read the articles, or that they were prejudiced or influenced to find against the defendant by reason thereof.

APPEAL from a judgment of the Superior Court of San Joaquin County, and from an order denying a new trial. D. M. Young, Judge.

The facts are stated in the opinion of the court.

Samuel M. Shortridge and Webster & Blewett, for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant and two other Chinese, Charlie Suey and Sam Mie, were jointly charged by information filed in the superior court of San Joaquin County with the crime of murder in the alleged willful, deliberate, and malicious killing of a fellow-countryman named Ching Sing. The defendant was given a separate trial and the jury convicted him of murder of the first degree, fixing his punishment, however, at imprisonment for life. He has brought the case to this court on appeals from the judgment and the order denying him a new trial.

The homicide occurred in the city of Stockton, in the county above named, on the fifth day of March, 1917, between the hours of 1 and 2 o'clock P. M. There is no claim that the evidence is insufficient to support the verdict, but it is vigorously insisted that prejudicial error was committed by the trial court in certain of its rulings whereby certain evidence offered by the defendant was excluded from the record; that the district attorney and the attorney specially employed

to assist in the prosecution of the accused were guilty of misconduct at the trial which so seriously prejudiced the rights of the defendant as to have prevented a fair and impartial trial of the question of his guilt or innocence, and that the court erred in denying the accused a new trial upon the ground, predicated upon an affidavit by the defendant, that the jury received out of court evidence the effect of which was greatly to prejudice the jury against the defendant.

The killing of the deceased, by whomsoever done, involved a deliberate and malignant murder. He was either standing on the sidewalk in front of a building situated on one of the streets of what is known as "Chinatown," in the city of Stockton, or had just stepped to the sidewalk from a building, when he was viciously attacked by several young Chinese (some of the witnesses said three and others thought there were four) and shot to death. The attacking Chinese fired upon the deceased simultaneously, thus disclosing a preconcerted arrangement to kill him, and after he fell to the sidewalk, probably lifeless, the murderers, or some of them, stepped up to where he lay and fired several shots into his body. The physician who held the autopsy at the *post-mortem* examination testified that he found in the body twenty-three wounds, of which thirteen were entrance wounds.

After the shooting ceased, the Chinese committing the crime ran from the scene of the shooting, at least two of them throwing the weapons with which they shot the deceased to the sidewalk near where the homicide occurred and where they were a few minutes after the shooting found and picked up by an officer. The homicide was witnessed by several Chinese and partly seen by some white men. Several of the witnesses, both Chinese and white, positively identified Fong Sing, the defendant, as one of the Chinese who did the shooting.

A short time after the tragedy, Fong Sing and Charlie Suey were apprehended and placed under arrest several blocks from the place at which the deceased was killed. It appears that J. E. McFarland, a constable of Stockton, heard the shooting and thereupon hastened to the street from which direction the sound of the shooting seemed to him to come. On reaching the northeast corner of Washington and Center Streets, he looked east or in the direction of the corner of Washington and El Dorado Streets, and there observed a

large number of people running in different directions. He saw three young Chinese running from the scene of the shooting on Washington Street in a westerly direction, going as far as the corner of Washington and Center Streets. One of the three Chinese, Sam Mie, disappeared or left the other two, Fong Sing and Charlie Suey, and went in a different direction. McFarland ran after Fong Sing and Charlie Suey, but the Chinese outsprinted the officer and soon got out of his sight. McFarland kept up the pursuit, inquiring of different people he met on the streets whether they had seen the fleeing Chinese, and finally he espied the defendant and Charlie Suey walking together at a point on Madison Street, near Lafayette, and in near proximity to a lumber-yard. The officer commanded the men to halt, but they started to separate and go in different directions, when McFarland drew his revolver and threatened to shoot unless they surrendered. The two men thereupon stepped up to the officer, who placed them under arrest. Just as the officer was about to start to jail with his prisoners, one Zuiver (who testified for the people) called out to McFarland and stated to the officer that he saw Fong Sing, just before he started toward the officer, throw some article, the exact character of which he did not then know, into a vacant lot, and at about the same time Zuiver went to the spot where the article was thrown, found a pistol, and delivered the same over to the possession of McFarland. Upon examination, the pistol was found to contain four empty and two loaded shells. McFarland testified that from the condition of the empty shells and the odor from the weapon he was of the opinion that the pistol had been discharged very shortly before it came into his possession.

The defendant claimed that he was not present at the scene of the homicide at the time of the commission thereof, but that when the shooting took place he and Charlie Suey were at the lumber-yard of the Stockton Lumber Company, located on the corner of Sonora and Commerce Streets, in the city of Stockton, several blocks from where the deceased was slain. Accordingly, the defendant set up and undertook to sustain an *alibi* and it is the ruling of the court disallowing certain testimony offered by the defendant in support thereof which constitutes the point first urged in the briefs as a sufficient ground for a reversal, and it arose in this way: The defendant claimed and attempted to prove at the trial that, at about

the noon hour on the day of the killing, he went to and was at the laundry of one Gong Sue, a Chinese laundryman, whose place of business was on the easterly side of Center Street, between Washington and Lafayette Streets; that, when he arrived at the laundry, Gong Sue and Charlie Suey, the defendant's codefendant, were there and then eating lunch; that, after lunch was finished, the three Chinese were engaged in and carried on a conversation for some time, and that very shortly after 1 o'clock the defendant and Charlie Suey started to go to the lumber-yard of the Stockton Lumber Company, which, as above stated, is situated several blocks from the place where the homicide occurred, for the purpose of procuring some lumber for Gong Sue; that they arrived at the lumber-yard at about 1:20 or 1:30 P. M., and there met one Alfred Love, a building contractor of the city of Stockton, who spoke to Charlie Suey, with whom he was personally acquainted; that, while they were at the lumber-yard, the sounds of shooting, apparently coming from the direction of Chinatown, were heard. The witness, Love, above referred to, testified to having seen Charlie Suey and Fong Sing in the street, near the lumber-yard, on the day and at about the hour above mentioned, and further testified that he at that time spoke to Charlie Suey. In further support of the *alibi*, the defendant sought to prove by Gong Sue that, on the day of the homicide, and shortly after 1 o'clock P. M. of that day, he sent Charlie Suey to the lumber-yard to get some lumber and that the defendant was then and had been for some minutes previously at the laundry, and started with Charlie Suey to the lumber-yard. An attempt was further made to have Gong Sue testify as to whether defendant himself at that time stated that he was going to accompany Charlie Suey to the lumber-yard. To all that testimony the people's objections were sustained by the court on the ground that it was immaterial. The theory upon which it is contended that the testimony thus sought to be brought before the jury was competent and proper is that it was a part of the *res gestae*—that is to say, that it related to and tended to explain the transaction embracing the *alibi* of the defendant or the acts and movements on his part at the precise time of the homicide which were inconsistent with and contradictory to the claim that he was present at the place where the deceased

was killed at the time he was shot to death and participated in the act of destroying the latter's life.

The doctrine of *res gestae* is so well understood that it is hardly necessary to remark that under that rule evidence is admissible of extrajudicial declarations tending to explain or show the character or motive or purpose or intent of a transaction, itself a fact in dispute, which would under other or ordinary circumstances be excluded as hearsay or self-serving. The rule, in other words, recognizes the competency of certain hearsay testimony, and is an exception to the general rule of exclusion as to that class of proof. Our Code of Civil Procedure, section 1850, thus states the rule: "Where, also, the declaration, act, or omission forms part of a transaction, which is itself the fact in dispute, or evidence of that fact, such declaration, act, or omission is evidence, as part of the transaction."

The propriety of such testimony, and, indeed, the theory upon which it is taken out of the general rule against hearsay testimony, proceeds from the supposition that the declarant, without an opportunity deliberately to concoct a false statement or story concerning the transaction for the express purpose of exonerating himself from censure or culpability in connection therewith, has spontaneously made some statement which tends to explain the nature, quality, motive, or intent of the transaction. In other words, it is a statement or declaration explanatory of the character of the transaction, its quality, purpose, or motive, given under such circumstances as to preclude the idea that it involved a falsehood deliberately meditated and conceived and given expression for the benefit or advantage of the declarant himself.

There are many cases which have sanctioned testimony of extrajudicial declarations where a defendant in a criminal case or a party to a civil action has made some statement as to some matter arising in connection with a transaction constituting the principal fact in dispute. Declarations in such cases, however, have generally been admitted, not altogether under the rule of *res gestae,* or because they were deemed as strictly a part of the principal transaction in dispute, but because they were regarded as indicative of the frame of mind of the declarant as to some act growing out of the principal transaction, and exhibited under such circumstances or conditions as to make it reasonably certain that it was not the re-

sult of a premeditated design to prepare, *pro re nata,* a statement of the fact; and it is generally upon this latter theory, rather than upon the theory that it is a part of the transaction in dispute, that the declaration of a person as to his destination on leaving his home or some other place is receivable as evidence of his intention or purpose where such declaration has a material bearing upon his connection or want of connection with the principal question in issue.

In his treatise on the "Law of Evidence," section 108, Mr. Greenleaf thus states the rule: "When a person . . . leaves his house . . . his declarations, made at the time of the transaction, and expressive of its character, motive or object, are regarded as verbal acts, indicating a present purpose and intention, and are, therefore, admitted in proof like other material facts."

The rule has been applied, under varying conditions, in many cases, both civil and criminal, and, without examining them in detail herein, we may cite the following cases in which the application of the principle involved in the rule is exemplified: *State* v. *Mortenson,* 26 Utah, 312, [73 Pac. 562, 569]; *State* v. *Power,* 24 Wash. 34, [63 L. R. A. 902, 63 Pac. 1112]; *State* v. *Howard,* 32 Vt. 380; *State* v. *Dickinson,* 41 Wis. 299; *United States* v. *Craig,* 25 Fed. Cas. 682; *Territory* v. *Conk,* 2 Dak. 188, [47 N. W. 395]; *Lakeshore & M. S. R. Co.* v. *Herrick,* 49 Ohio St. 25, [29 N. E. 1052]; *State* v. *Jones,* 64 Iowa, 349, [17 N. W. 911, 20 N. W. 470]; *Denver & R. G. R. Co.* v. *Spencer,* 25 Colo. 9, [52 Pac. 211]; *Grimes* v. *State,* 68 Ind. 193.

But, since the rule constitutes an exception to the general rule excluding the admission of hearsay testimony, it must, of course, be confined in its application strictly to the circumstances or conditions giving rise to the reason for the recognition of that class of testimony as a legal method of proving a fact, and hence we do not believe that the scope of the rule can reasonably be so far extended as to justify the admission in evidence of the declaration of a third party to the defendant in either a criminal or civil action involving a request by the former that the latter go to some particular place, unless such declaration is accompanied or followed by a declaration by the party himself that he intends to go to such place. Therefore, referring to the present case, the fact that Gong Sue might have requested Charlie Suey to go

to the lumber-yard and get some lumber, of itself, or in the absence of some statement by the defendant in response to such request indicating his intention to accompany Suey to the lumber-yard, would not be admissible. The rule contemplates some utterance by the party to the action himself and not that of a third party for the very obvious reason that the declaration is admissible only because it is supposed to be expressive of what is in the declarant's own mind with respect to the intention as to his destination, which, manifestly, could not be determined from what some other person might have said, unconnected with any declaration in that particular by the party himself. If, however, as is the claim here, the witness, Gong Sue, would have testified that the defendant, upon the request being made by Gong Sue of Charlie Suey that the latter go to the lumber-yard for the purpose of getting lumber, declared that he intended to accompany Charlie Suey to the lumber-yard, then we think the entire conversation might properly have been given in evidence under the rule above explained. The court below should, therefore, have admitted the testimony; but we cannot say that the ruling excluding it was prejudicial in view of considerations to which we will now refer.

The witness, Alfred Love, an American and a building contractor and a citizen of Stockton, presumably of reputable standing in that community, testified that he saw Charlie Suey and another Chinese in the street, about forty feet from the lumber-yard, on the day of the homicide, near the hour of 1 o'clock P. M. The precise moment of time when the deceased was shot no witness pretended to state, but it was given as approximately at 1 o'clock—that is, at some point of time between 1 and 1:30 P. M. Nor did Love pretend to be able to fix or state the precise moment of time at which he saw the two Chinese near the lumber-yard. His fixing of the time amounted, as must be so in a majority of such cases, to a mere approximation. There is nothing to show that there was any occasion for him to ascertain or fix the exact moment when he saw them.

There was testimony, as seen, that the Chinese committing the act, after doing so, ran from the scene thereof, and that two of them went in the direction of the lumber-yard—that is, in that general direction. The defendant and Charlie Suey were arrested near the lumber-yard, and in their con-

versations with the officers after their arrest made no claim that they had been at the lumber-yard for the purpose of getting lumber. Thus, it is manifest, Love's statement that he saw Suey and the defendant at the lumber-yard at about the hour of 1 o'clock P. M. might have been true, and it might have been also true that the two Chinese stopped where Love saw them in their flight from the scene of the shooting. Either such was the theory upon which the jury decided the question of *alibi* or else they entirely repudiated the testimony of Love, which, he not being impeached, is not probable. But in any event, we cannot see how the declaration of the defendant as to the point of his destination when he left the laundry or the testimony of Gong Sue as to such declaration could have gone any further in support of the *alibi* than was derived from the testimony of the witness, Love. Testimony of the declaration of the defendant himself, although admissible under the exception to the general rule, was in the fullest sense hearsay and self-serving, and if the jury did not believe Love, a white man, or concluded that he was mistaken as to the part of the day he saw Suey and the defendant near the lumber-yard, or, if, accepting Love's testimony as to the approximate time he saw the two Chinese near the lumberyard, the jury were persuaded that the circumstance so testified to was not inconsistent with the theory, which is by no means without support from the evidence, that Suey and the defendant were among the perpetrators of the homicide and immediately upon its commission fled to the place where they were seen by Love, then we may safely assume that the jury would have attached no probative value to the testimony of Gong Sue revealing a declaration by the defendant indicating his intention of going to the lumber-yard. In other words, and in brief, we cannot perceive how the excluded testimony could have added any more support to the *alibi* theory than it derived from the testimony of an unimpeached white witness. We think, therefore, that section $4\frac{1}{2}$ of article VI of the constitution applies here.

It is next urged that error prejudicial to the defendant followed from asking Gong Sue, on cross-examination, if it was not a fact that he was engaged in the business of selling lottery tickets, he having on direct examination stated that he was conducting a laundry business. That question was not objected to, and the witness replied that lottery tickets were

not sold at his place and that the only business carried on at his place was that of a laundry. He was then asked: "Don't anybody sell lottery tickets in there?" To that question objection was interposed by the defendant and sustained by the court. It is contended that the injury resulting to the defendant from the above questions to his witness by the district attorney was in the insinuation with which they were pregnant that said witness was engaged in carrying on a business prohibited and penalized by the law.

Generally, the purpose which an attorney has in view in asking his witnesses as to the business in which they are engaged is to bolster the reliability of their testimony, and we cannot conceive of any just reason why, in such a case, it is not proper for the party against whom or whose interests a witness testifies to show, on cross-examination, that, as a matter of fact, the witness is not conducting the business in which he has said he is engaged, or, if he is, that in connection therewith he is also carrying on a traffic of a less reputable character. But, at any rate, no objection was made to the first of the several questions propounded on that line of cross-examination, and the objection to the last question was sustained, and, therefore, no review of the complaint in that respect is justified, not even upon the theory that the objection goes to the question of the misconduct of the district attorney, since the objection was solely upon the ground that it was not cross-examination and no specific objection or exception to the alleged misconduct of the prosecuting officer made. Moreover, the witness positively denied that he ever conducted a lottery business, and we are not to assume that the jury concluded that he lied in that particular, no other testimony having been received relating to that matter.

Much that is said in the foregoing applies with equal force to objections to a similar character of questions propounded on cross-examination to defendant's witness, Yee Won.

It is next urged that the district attorney was guilty of misconduct seriously militating against the substantial rights of the accused by referring in his argument to a matter which it is claimed was not brought out in the testimony and which tended to show a conflict between the testimony of the witness, Love, and that of the defendant upon a material fact in connection with the proof received in support of the *alibi.*

It appears that the stenographic reporter caused it to appear in his notes that Love shook hands with Charlie Suey when they met near the lumber-yard, whereas Love testified that Charlie Suey was a distance of some forty feet from him when he greeted the Chinese and did not say that he shook hands with Suey. Counsel for the defendant interrupted the district attorney when he was making the point arising from the alleged conflict upon that proposition, and called his attention to the alleged fact that, during the progress of the trial, when it developed that the reporter had made the defendant say that Love and Suey had shaken hands on the occasion mentioned, it was shown and agreed between counsel on both sides that, in point of fact, the defendant gave no such testimony, and that its appearance in the reporter's notes of the testimony was solely the result of error on the part of the reporter—that the latter, in other words, misunderstood the testimony of the defendant as it was translated by the interpreter, and so made him say that Suey shook hands with Love, when he in fact made no such statement. But the district attorney, in effect, insisted that the defendant did testify that Suey shook hands with Love, and that the record disclosed that he so testified, and said nothing about an understanding or stipulation between counsel that the reporter had erred in so reporting the defendant, nor did he reply to the statement of defendant's counsel that any such an understanding was had or that any correction was made in the particular referred to of defendant's testimony. The court remarked, referring to this controversy between counsel, that "the jury must remember the testimony; they will have to determine what the testimony is."

The above is all that the record discloses relative to the matter under consideration—that is to say, with the exception of the above-explained colloquy between counsel, the record does not show, or at least our attention has not been directed to any part of the record where it is shown, that there was any correction made of the testimony of the defendant in the respect indicated above or agreed to by counsel on both sides, and in the absence of a proper showing in that regard, this court cannot say upon the record that the special prosecutor was not justified in making the point to which objection is here made. In other words, admittedly the reporter's notes showed that the defendant did testify that Suey shook hands

with Love, but the record does not show that the reporter
made a mistake in so reporting the defendant's testimony or
that it was stipulated at the trial that any such an error was
made by the reporter, or that there was any correction of the
defendant's testimony in that respect.    Therefore, as stated,
there is before us no record upon which we can base the con-
clusion that the special prosecutor went beyond the record
when he pointed out the inconsistency between the testimony
of Love and that of the defendant as to the manner in which
the former met and greeted Charlie Suey.

The last point pressed upon us for a reversal is that the
court erred in refusing to grant the defendant a new trial on
the ground that the jury "received evidence out of court
other than that resulting from a view of the premises."
(Pen. Code, sec. 1181, subd. 2.)    The motion for a new trial
on said ground was, as above stated, supported by the affi-
davit of the defendant, setting forth the following facts:
That, originally, attorneys Seymour and Eicke represented
the defendant as attorneys in the case; that, for some reason,
the specific nature of which is not disclosed by the record,
Messrs. Seymour and Eicke, after the jury was impaneled and
sworn, and before the taking of testimony was proceeded
with, asked and were granted permission to withdraw from
further participation in the case as representatives of the ac-
cused; that, thereafter, the "Independent," a daily news-
paper published in the city of Stockton, in reporting the with-
drawal of Seymour and Eicke from the case, stated, among
other things, that it was rumored that the defendant intended
to change his plea of not guilty to that of guilty; that the
"affiant is informed and believes that the jury so impaneled
and sworn to try said cause heard and took cognizance of said
common rumor that affiant intended to and was about to plead
guilty and read the articles indicated above and that in this
regard the said jurors took evidence out of court in said cause
or were biased and prejudiced against the defendant by rea-
son thereof."    Attached to said affidavit was the newspaper
article referred to therein, and also attached thereto was an
article published in the same newspaper the following day,
stating that the defendant, through a friend, positively denied
any intention of pleading guilty, and containing a statement
from Mr. Seymour, one of the attorneys who withdrew from
the defense of the defendant, that "the Chinese and their

friends maintained their absolute innocence of the crime charged, and that a difference of opinion having arisen in the conduct of the case, the attorneys for the defense had withdrawn in the best interests of their clients, a friendly interest still being maintained.''

It will be observed that all that the affidavit contains as showing that the defendant was prejudiced by the publication referred to is the mere inference to be drawn from the statement therein made, on the information and belief of the affiant, that the jurors saw and read the said article. There is no positive showing that the jurors, or any of them, read the article or that they were prejudiced against the defendant or influenced to find against him by reason thereof. Even if such a publication had been made before the jury were called to the jury-box and it developed that any juror had read the article, it would not *per se* have disqualified him from sitting in the case. To have disqualified him, it would have been necessary further to show that his mind had been by the article so affected relative to the case as that he could not give the defendant a fair and impartial trial, according to law. Moreover, if it may be assumed that the jury read said article, it may with equal propriety be assumed that they also read the subsequent article correcting the statement of the first that the defendant contemplated entering a plea of guilty, and thus it may be assumed (assuming that both articles were read by the jurors) that the effect of the first article was overcome by the last. But, however that may be, without something more positive than is shown here that the jurors read and were affected or influenced against the accused by the first article, it must be assumed that, even if they perused the article, they were intelligent enough to know their sworn duty and honest enough to have confined themselves in the determination of the very serious question of the guilt or innocence of the accused entirely to a consideration of the evidence as it was allowed to go before them under the rules of law submitted to them by the court for their enlightenment and guidance in the discharge of that all-important function.

We have discovered no legal reason for disturbing the verdict, and, for the reasons herein given, the judgment and the order appealed from are affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on October 24, 1918, and the following opinion then rendered thereon:

HART, J.—In a characteristically able argument, the senior counsel for the defendant urges a rehearing of this cause. There is nothing we can add to what has been said in the former opinion filed herein, except to express hearty concurrence in the general animadversion of the learned lawyer upon the practice too often resorted to in criminal cases by public prosecutors of lugging into their cases in argument matters having vital bearing upon the case which have not been brought in by evidence and which are calculated to deprive an accused of that fair and impartial trial which is guaranteed to him by the constitution and the statute laws of the state. A public prosecutor should be equally as solicitous of the protection of the rights of a citizen or other person on trial for his life or his liberty as the judge who presides at the trial, and it is obviously an egregiously erroneous notion if that public officer conceives it to be his duty to convict every person against whom a crime has been charged, regardless of whether he is or is not guilty or of whether the proof he is able to produce against one so accused is or is not sufficient to justify his conviction. And it is equally a mistake for such an officer to suppose that it is proper for him to present to the jury anything but strictly legal evidence in support of the charge, or that it is within the sphere of legitimate argument to prejudice the standing of the accused in the minds of those who are to determine an issue so serious to him by insinuating in the course of his address that some fact bearing strongly against the accused which has not been proved by proper evidence in reality exists. This court has on a number of previous occasions in a number of cases, notably in *People* v. *Hail*, 25 Cal. App. 342, [143 Pac. 803], condemned such practice. In the present case, however, as is stated in the former opinion, there is no such record as justifies us in reviewing the point that the special prosecutor was guilty of misconduct in referring to a matter in his argument which, it is claimed, was not brought into the case through the evidence. As explained in the former opinion, all that the record shows is that a controversy arose during the course of the prosecutor's argument as to whether it was conceded by counsel representing the people that the

court reporter had made a mistake in reporting that the defendant had testified that he shook hands with the witness Love at the lumber-yard, counsel for the defendant claiming that such concession had been made and that the mistake so made by the reporter had been corrected before the argument of the case was begun. Nowhere else in the record is it made to appear that a correction of the defendant's testimony in the particular referred to was made or that there was any suggestion by counsel that the reporter had made a mistake in any respect or particular in reporting his testimony. The prosecutor, when interrupted, did not admit that any such mistake had been conceded or that a correction of any such mistake had been made. He simply replied to the interruption: "If you didn't like the record, why didn't you correct it?" from which observation, and from the fact that he did not admit that a mistake in defendant's testimony had been conceded, or that any such mistake had been corrected, we felt justified in declaring, as we did declare in the former opinion, but which declaration counsel say we were not warranted by the record in making, that the special prosecutor *"in effect* insisted that the defendant did testify that Suey shook hands with Love, and that the record disclosed that he so testified," etc.

As above stated in the outset hereof, the learned attorney, as always he does, makes a forceful plea for a rehearing, but we do not thus feel persuaded that the conclusion we arrived at upon each of the points urged for a reversal, and from which conclusion necessarily followed the final result of the consideration of the record by this court, is erroneous.

The petition is denied.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 21, 1918.