[Crim. No. 1656. First Appellate District, Division One.—January 25, 1933.]

THE PEOPLE, Respondent, v. FRANK T. BLAKE, Appellant.

Philip B. Beggs for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton for Respondent.

BURROUGHS, J., *pro tem.*—The defendant was convicted of the crime of assault by means of force likely to produce great bodily injury. This appeal is from the judgment upon the verdict and from an order of the court denying a motion for a new trial.

The evidence in support of the verdict is briefly and fairly epitomized in respondent's brief as follows:

"One Alexander Morgan was a fish peddler and on the morning of November 24, 1931, was proceeding from the city of Santa Cruz towards the city of Capitola . . . As he approached the residence of some Japanese people by the name of Kitahara he passed the appellant Blake, who was proceeding in the same direction in an automobile, accompanied by a woman by the name of Ann Thomas. Morgan drove into the driveway of the Kitahara residence and then backed out upon the main road. Blake, who had by this time come abreast of the driveway, signaled to Morgan to stop. Morgan backed his truck across the road to the opposite side. Blake meanwhile had stopped his car and walked over to Morgan's car and there engaged in conversation with him. The story of the prosecuting witness from this point to the time that he was struck down by the appellant . . . reads as follows:

" 'Mr. Blake came over to me and he told me he had $500 on my head and that he wouldn't do anything himself because the position he was in, and everything, he couldn't—couldn't afford to; and I told him I was sorry to hear him say that because I hadn't had a chance to state my case before him, and everything; so he went on to ask me if I was afraid to face this,—no, first he asked me if I would back down the road where we could discuss this thing more clearly. I said "No, if you want to discuss it with me you can come into town and see my attorneys, Mr. Rittenhouse and Snyder"; and he said no, it wasn't necessary to do that, and wanted to know then if I would come across and talk to Mrs. Thomas, and I 'said I sure would, and he said "You are not afraid to go over there?" I said "No, I have got nothing to be afraid of—why should I be afraid?" When I went over there I was standing at the machine, Mr. Blake was standing at one side, partially in back of me. I started to talk to Mrs. Milang or Mrs. Thomas—Miss Thomas, and we were conversing back and forward, and the next thing I knew I was down on the ground. While I was lying on the ground I saw a dark object coming—that is the last I remember until I came to at the hospital. Q. Mr. Morgan, when you crossed the street with Mr. Blake Mrs. Thomas was in the car, was she? A. Yes sir. Q. Sitting in Mr. Blake's car? A. Yes sir.'

"In the vicinity of this point on the highway at which this assault took place there were three residences other than the Kitahara residence; the Christie residence, the Pimental residence and the Antonelli residence. From the vicinity of the Kitahara residence the two young girls of the Kitahara residence saw some of the details of the assault.

"Mary Kitahara testified that she saw the two automobiles coming down the road and saw Mr. Morgan drive into the driveway of her home and back out and also saw Mr. Blake get out of his car and go over to Morgan's car and there engage in a conversation with him. All this she saw from a window in the house. A few minutes later when she was out of the house she was attracted by a woman screaming and when she looked toward the automobile saw Blake kicking someone who was out on the ground.

"Little Alice Kitahara also stated that she was attracted by the screams of a woman and that when she looked

towards the spot from whence the screaming came she saw the appellant kicking someone who was on the ground. Both these girls testified that the woman who had done the screaming tried to pull the appellant away but was pushed back by the appellant, who proceeded to kick the man who was on the ground. Both these girls thereafter went up to the scene of the assault and saw Morgan lying on the ground.

"Mrs. Christie testified that she was cleaning a turkey in her kitchen and was attracted by the screaming of a woman and when looking out of the window in the direction from whence the screaming came she saw a man kicking another one who was on the ground . . . not only kicking him, but jumping up and down on his face. She further stated that the woman who evidently was the one who had screamed tried to push the appellant away, but in turn was pushed away herself, whereupon the appellant continued to kick the man who was on the ground." She further testified that she saw him jump on the man's chest.

"Mrs. Pimental, who was out at the chicken pens in the back of her residence stated that she was attracted by a woman screaming and that she came down the alley and that when she got to the corner of her house she still heard the screams and looking toward from whence they came she saw a man and woman standing, seeming to be kicking something that was on the ground.

"Two other witnesses were also attracted by the woman screaming, they being Eugene Mersaroli and his father-in-law, Mr. Antonelli. These two men were working on a new addition to the Antonelli residence and upon hearing the screaming looked towards the point from whence it came and both saw the appellant Blake kicking a man who was on the ground. They ran to the road and by that time the appellant Blake, having gotten into his car, had arrived almost abreast of them. Mr. Antonelli shouted to him to stop and when the appellant refused to do so he hurled a stone through the windshield of the appellant's car. However, the appellant did not stop but continued on his way.

"Several of the witnesses who heard the woman screaming stated that she exclaimed: 'My God, you have killed him.' . . .

"Chas. C. Houck, a Justice of the Peace of the City of Santa Cruz, stated that at a time which would have been approximately immediately after the assault the appellant came into his office and stated that he had given a man whom he called Alec 'a good trimming' and had 'beaten him up', and he wanted to pay his fine immediately. . . .

"The defense attempted to show a situation contrary to that testified to by the prosecuting witness and attempted to show that the assault was started by the prosecuting witness, Morgan. The appellant himself stated that it was Morgan who had hailed him first and that he had not hailed Morgan. In general, Blake's testimony was to the effect that Morgan had commenced the assault and that in order to protect himself it was necessary to resist this assault and to strike Morgan several times, and also to kick him to free his legs from Morgan's grasp."

As a result of the assault Morgan was not only beaten unconscious but the injuries inflicted were extremely severe, many of them being permanent, and his face being permanently disfigured. In this regard the record shows that both the upper and lower jaws were fractured, the upper being fractured in two places; the bones forming part of the wall of the sinus, back of the nose, were also fractured; his nose was broken and completely flattened, the cartilage being knocked free from the bone, flattened, and more or less destroyed, so that transplantation of cartilage from other parts of the body will be necessary to restore it to normal shape; there was a contusion of the right ear, lacerations of the upper and lower lips, nose and the cheeks; an incised wound on the right ear; both eyes were contused and badly swollen; and there were hemorrhages from the ears and nostrils. In fact, as appears from the photograph inserted in the record which was taken shortly after the assault, Morgan's face was almost a solid mass of bruises, cuts and contusions, and very badly swollen; so much so that the attending doctor, who had known him since boyhood, did not recognize him. Some of the wounds became infected, and on account of the infection and extreme swelling surgical treatment to reduce the fractures was impossible for some five weeks. He was confined in bed in a hospital for a month and then at his home for a month; and even at the time of trial which took place some

three months after the assault he was unable to perform any kind of work.

The evidence disclosed that the Ann Thomas referred to was the mistress or paramour of the defendant Blake, and it was claimed by Blake that the prosecuting witness Morgan had attempted, several months prior to the alleged assault with which Blake is charged, to commit the crime of rape upon her person. Appellant offered to prove the truth of these charges of attempted rape, but the court refused to allow such proof. Appellant claims that the refusal to allow such evidence was prejudicial error. It is said in appellant's brief: "It is the theory of the defense that not only were these matters material, relevant and to be admitted in evidence upon the theory that they were part of the *res gestae* to prove the state of mind existing between the parties, that is to say, as to their immediate apprehension of danger following along the theory in line of defense in that the act of defendant Blake was self-defense . . . " In *People* v. *Wong Ark,* 96 Cal. 125 [30 Pac. 1115], it is said: "It is often difficult to determine what acts or declarations are part of the *res gestae.* There is an apparent conflict in the authorities on the subject. Each case must be determined upon its own peculiar facts. Wharton says: 'The distinguishing feature of declarations of this class is, that they should be necessary incidents of the litigated act,—necessary in this sense, that they are part of the immediate concomitants or conditions of such act, and are not produced by the calculated policy of the actors. . . . The rule before us, however, does not permit the introduction, under the guise of *res gestae,* of a narrative of past events, made after the events are closed, by either the party injured or by the bystander' . . . " This rule has been sustained in *People* v. *Fong Sing,* 38 Cal. App. 253 [175 Pac. 911]; *Coryell* v. *Clifford F. Reid, Inc.,* 117 Cal. App. 534, 541 [4 Pac. (2d) 295]; 8 Cal. Jur., p. 92, sec. 190 et seq. In the case at bar the offers of proof were of acts alleged to have occurred several months prior to the assault made by the defendant in this case, and were unconnected therewith; they could not under any theory furnish a justification for the assault made by the appellant. Whatever the state of mind of the parties may

have been, such evidence could not furnish a justification for this assault.

It is further contended that appellant should have been permitted to introduce in evidence proof of the alleged assaults, as a matter of impeachment of the prosecuting witness Morgan, because he had denied having committed such acts. We have already held that such charges were immaterial as evidence here and not germane to the case; therefore it would be an impeachment upon an immaterial matter, but beyond this, the truth or falsity of these acts were not brought out on direct examination, but on the cross-examination of the prosecuting witness. In 27 California Jurisprudence, page 106, it is said: " . . . a party may not, under the guise of cross-examination, introduce evidence that is not competent within the meaning of the established rules. Accordingly, a party may not cross-examine his adversary's witnesses upon irrelevant matters for the purpose of eliciting something to be contradicted; if he does this the answer of the witness is conclusive and may not be contradicted."

The next assignment of error is that the court, over the objection of appellant, permitted the district attorney in his argument to the jury to comment on the failure of the defendant to introduce in evidence the shoes or moccasins that were worn by him at the time of the assault, and also the further statement of the district attorney to the jury that he could not compel the defendant to produce them. The defendant offered himself as a witness in his own behalf and he testified in substance that at the time of the alleged assault he wore moccasins. Another witness testified that they were real moccasins and have no soles on them, but are made of heavy leather. It has been held that the district attorney may comment upon the failure of the defendant to produce material witnesses which would substantiate his story (*People* v. *Piero,* 79 Cal. App. 357 [249 Pac. 541]); that it is not misconduct for the district attorney to refer in his argument to the fact that a co-defendant was not called upon to testify on behalf of the defendant (*People* v. *Ye Foo,* 4 Cal. App. 730 [89 Pac. 450]). Many other instances could be cited along similar lines, but we think the foregoing decisions are sufficient to sustain the ruling of the court in permitting the district·

attorney to comment on the failure of the defendant to produce the shoes or moccasins that were worn by him.

■ The appellant complains of the action of the court in refusing to give certain instructions requested by him. The first complaint is based upon the refusal of the court to give an instruction requested by him on the question of flight, and in giving the instruction on that subject offered by the People. The instruction given is in the language of section 1127c of the Penal Code. It is also provided in that section that ''no further instruction on the subject of flight need be given''. It is claimed that the instruction given presupposes a question of fact as having been proved, that is, that the defendant did in fact flee from the scene of the crime, and that the instruction thus took from the jury the right to determine that question. We are of the opinion that as the law specifically provides that no other instruction on the question of flight need be given, it is unnecessary to give any further instruction on that question. However, an examination of the other instructions given by the court discloses the fact that they placed before the jury in unmistakable language that all questions of fact were solely for the jury to determine. We do not think there could be any misunderstanding by the jury that the question of flight was one of fact within their province to determine. ■ It is a further complaint that the following instruction is erroneous because it takes from the jury the possible apprehension of danger that the defendant might have had at the time of the assault: ''You are instructed that no man is entitled to avenge a real or fancied insult or assault of another person occurring out of his presence and at another time or place. It would not justify an assault on the part of the defendant Frank T. Blake if at some. time prior to the 24th day of November, 1931, A. Morgan insulted or assaulted any other person out of the presence of Frank T. Blake. By this instruction, the court does not even intimate or suggest that the defendant did or did not commit an assault, as that and all other matters are to be exclusively determined by you as triers of the facts.'' As previously stated, it is fundamental that the instructions must be taken as a whole. In another instruction the court instructed the jury that ''the defendant was entitled to act upon appearances, and if the language

and the conduct of Mr. Morgan was such as to induce in the mind of a reasonable man, under all the circumstances then existing and viewed from the standpoint of the defendant, a belief that he was about to be attacked by Morgan, it does not matter if such danger was real, or was only apparent; and if the defendant acted in self-defense from real and honest convictions as to the character of the danger, induced by the existence of reasonable circumstances, he should be acquitted, even though he was mistaken as to the extent of the danger.'' Again the court instructed the jury that if they had a reasonable doubt as to whether the words and actions of the prosecuting witness constituted such an appearance as would cause a reasonable man in defendant's position to believe that he was in immediate danger of attack, they should resolve the doubt in favor of the defendant. The jury was also fully instructed on the question of self-defense. We think that these instructions cured any possible error in the instruction complained of. ■ Another instruction was to the effect that if the jury believed beyond a reasonable doubt that the defendant made an assault upon the person of the complaining witness, and that it was not in lawful and necessary self-defense, and if they further believed that the assault was made ''by a means or force likely to produce great bodily injury when made in the manner and by the means used by the defendant'', they should find the defendant guilty as charged. It is claimed that the part of the instruction above quoted assumes a question of fact as having been proved, and as such infringed upon the province of the jury. There is no contradiction in the evidence as to the means used by the defendant. He stated that he kicked the prosecuting witness several times, claiming that such kicking was necessary. Many eye-witnesses also testified that the assault was committed by means of kicking. The appellant testified that he also used his fists in striking the prosecution witness. Therefore there is no conflict in the evidence upon this subject. Further, the instructions were so replete with statements that the court had nothing to do with the determination of questions of fact, that the jury could not have misunderstood the instruction as given by the court. ■
It is contended that two other instructions assume that any physical combat between two persons, if one should be

larger than the other, necessarily comes within the purview of an assault as defined in section 245 of the Penal Code, and that the larger of the two men would be guilty of the crime as defined by that section. We cannot agree with counsel upon the effect of these two instructions. They merely inform the jury that the discrepancy in size between the defendant and the prosecuting witness was an element that could be taken into consideration in determining whether the means or force was reasonably calculated to produce great bodily injury. The jury had a right to consider such evidence in determining the nature and character of the assault. Therefore the instructions are not subject to the objection made.

The instructions are very voluminous and cover every phase of the case. The appellant was accorded a fair trial. The assault was brutal in the extreme and, as stated, inflicted very serious injuries upon the complaining witness. There has been no miscarriage of justice and the judgment and order denying the motion for a new trial should be affirmed. It is so ordered.

Knight, Acting P. J., and Cashin, J., concurred.