[Crim. No. 1946. Third Dist. Mar. 4, 1946.]

THE PEOPLE, Respondent, v. GRANT PILGRIM, Appellant.

Blaine McGowan for Appellant.

Robert W. Kenny, Attorney General, James O. Reavis, Deputy Attorney General, John Childs, District Attorney, and Geo. W. Howe, Assistant District Attorney, for Respondent.

THOMPSON, J.—The defendant was charged with murder and convicted of manslaughter. He made two attacks upon Don Harrison, an old Indian, striking him in the face with his fist, and knocking him down each time. As a result of the blow in the second attack, the deceased struck his head upon a rock, fracturing his skull which resulted in cerebral hemorrhage from which he deid. The defendant claimed that he struck the deceased in necessary defense of himself and of his young nephew, Carol Gensaw. A motion for new trial was denied. Defendant's motion for probation was also summarily denied. From the judgment of conviction of man-

slaughter and from the order denying a new trial the defendant has appealed.

For grounds of reversal it is contended the court erred in refusing to give certain instructions, and that the prosecuting officer was guilty of prejudicial misconduct in statements which he made in his argument to the jury. It is also asserted the court erred in denying defendant's motion for probation without a hearing.

The assault which resulted in the death of Don Harrison, an old, intoxicated Indian seventy years of age, occurred in the town of Klamath about eight o'clock on the evening of June 4, 1945. The defendant is a muscular young Indian nineteen years of age. He had been employed as a woodsman. The defendant and the deceased had been acquaintances for several years. No previous trouble existed between them. There is no evidence that the deceased was quarrelsome.

Carol Gensaw is a nephew of the defendant. He was twelve years of age. About eight o'clock on the evening of the homicide Gensaw and his companion, Dale Sanderson, were sitting in an automobile. It belonged to Matthew Fisher. The machine was parked in front of a restaurant in Klamath. They sat in the car quarreling and striking each other. Fisher, the owner of the car, who was in the restaurant, heard the disturbance and came out and told them to stop quarreling. Carol Gensaw either got out of the machine, or he was pulled out by Fisher. Gensaw stood on the sidewalk crying when Don Harrison, the deceased, came walking along the sidewalk toward them. Seeing Gensaw crying, the old man evidently laughed at him and the boy then began "poking at him," or "socking him." The deceased "pushed him aside and started walking." The defendant then arrived. He said his nephew told him Harrison had struck him in the stomach. The defendant testified, "I got there and I asked Don what the heck you hit him for, and Don he stepped back, his fists come up, and that is when I hit him the first time." The deceased told the defendant he did not strike his nephew. He was not then threatening to do so. He was merely laughing when he was first struck and knocked down. Another Indian helped him to arise. His mouth was bleeding. Without attempting to retaliate and without threatening the defendant, the deceased immediately "walked off the sidewalk and started back for the alley right next to the meat market." The defendant left the scene of the first assault and going over to the auto-

mobile parked near by, he removed his coat and, placing it on the seat of the car, he immediately returned, and, following the deceased, stepped in front of him and again struck him in the face with his fist and knocked him down. It was not claimed that the deceased then threatened the defendant, and Carol Gensaw was not then present. As a result of that second attack the old man's head struck a rock and his skull was fractured, causing cerebral hemorrhage from which he died.

George Macil, a friend of Gensaw and Sanderson, the boys who had been quarreling, stood near by and saw the entire affair. He testified that the deceased told the defendant that "he didn't touch" Gensaw. He said that the defendant struck the deceased on his chin or mouth, with his fist, and knocked him down; that Harrison was bleeding; that he got up and "started walking away;" that "Grant [the defendant] went over to the car and took off his coat, . . . then went back to Don Harrison. . . . He socked him again. . . . He fell down on the ground and hit his head on a rock." He testified that at no time did he see the deceased attempt to strike the defendant; that when the defendant hit him the last time "he was going away from the defendant." Matthew Fisher corroborated the testimony of Macil in regard to the last fatal blow which resulted in the death of the deceased, and upon some other details of the affair.

■ There is substantial evidence that the defendant made an unprovoked assault upon an apparently harmless, good-natured, fat, old, drunken Indian. He was seventy years of age and weighed two hundred pounds. He had been drinking for a couple of days. There is no evidence that he was quarrelsome. Evidently the defendant struck him in the heat of passion merely because he had been told that he had previously hit his nephew in the stomach. He was not then threatening to attack the boy. Moreover, the evidence indicates that the deceased did not strike the boy. The implied finding of the jury that the defendant did not strike and kill the deceased in necessary self-defense or in defense of his nephew is supported by the evidence.

■ We find no error in the refusal of instructions. The jury was fairly and fully charged upon every essential element of the offense, including the degrees of murder, the crime of manslaughter, the rule of self-defense and the right to use necessary force to protect a relative against imminent danger of great bodily harm.

The appellant contends that the court erred in rejecting three instructions which he offered. We think not. They were adequately covered by other instructions which were given to the jury. The first omitted instruction reads in part:

"The burden is upon the prosecution from the beginning to the end of the trial. It is never upon the accused to establish his innocence of the crime of which he is informed against. If there is a single material allegation of the Information that the prosecution has failed to prove to your minds to a moral certainty and beyond a reasonable doubt, you must find the defendant not guilty."

The second one covered substantially the same principle regarding the burden of proof. The third instruction which was refused reads:

"The court instructs the jury that the law is that a man or a relative assaulted or about to be assaulted is not required by law to wait until his adversary is on equal terms with him, but may rightfully anticipate his action and kill his assailant, when to strike in anticipation reasonably appeared to be necessary to self-defense as I have herein defined."

The jury was repeatedly and properly instructed that the burden of proof was on the "state" to prove the guilt of the defendant "beyond a reasonable doubt and to a moral certainty." That rule was applied to every essential element of the crime. The jury was told that "If you entertain any reasonable doubt upon any single material fact, you are to return a verdict of not guilty." It was also charged that the defendant was presumed to be innocent until his guilt was proved beyond a reasonable doubt, and that the facts should be reconciled, if possible, upon the theory of his innocence.

The first and second refused instructions were adequately covered by others which were given to the jury. We are unable to perceive how the jury could have been misled regarding the presumption of innocence or the burden of proof. Moreover, while those proffered instructions are technically correct, they may be misleading. In both of them the jury was told, in effect, that the burden of proof was never cast upon the defendant. That assertion, in a trial for murder, is not strictly correct. Section 1105 of the Penal Code provides that:

"Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving cir-

cumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.''

See *People* v. *Wells*, 10 Cal.2d 610, 617 [76 P.2d 493].

However, since the court fully instructed the jury upon the principle of the burden of proof, it is not necessary for us to determine whether the refused instructions were misleading under the circumstances of this case, and therefore properly rejected on that account.

The third omitted instruction was also amply covered by others which were given to the jury. At the request of the defendant the jury was instructed that:

''The right of self-defense of a party violently assaulted by another, to repel such attack and fully protect himself *or a relative*, is a law of nature. . . . The right is expressly recognized by our own statutes, and the conditions under which it may be asserted are clearly defined. These are, that the party was not himself the first aggressor, or if the aggressor, that he had in good faith withdrawn from the contest before the fatal blow. Second, that the slaying was necessary to prevent the infliction upon himself *or a relative* of a great bodily injury by the party slain.''

At the request of the defendant the jury was further charged that to justify the killing on the ground of self-defense or for the protection of a relative, it is not necessary ''that the danger be actual,'' but, on the contrary, ''it is enough that it be an apparent danger, such an appearance as would induce a reasonable person in defendant's position to believe that he *or a relative* was in immediate danger of great bodily harm.'' The court concluded that feature of the charge by saying, ''If this was defendant's position, it was his right to repel aggression and fully protect himself *or a relative* from such apparent danger.'' Those instructions certainly covered the charge contained in the rejected one.

The instructions which were given fully protected the rights of the defendant. The jury evidently concluded that the defendant was the aggressor, which is amply supported by the evidence, and that the deceased had not assaulted defendant's nephew, Carol Gensaw, or if he did strike him that he did not threaten to repeat the assault at the time the deceased was knocked down and killed.

We are of the opinion the defendant was not preju-

diced by the challenged statements of the prosecuting officer made to the jury in the course of his argument. The first assignment of misconduct consisted of a statement to the jury by the prosecuting attorney that, "If the old gentleman struck the little boy in the stomach, why didn't they have the young man here?" To that statement the attorney for the defendant objected and asked the court to instruct the district attorney "to discontinue that line of argument." Clearly there was no wilful attempt to prejudice the jury. The prosecuting attorney promptly withdrew the statement and asked both the court and the defendant's attorney to excuse him. The court was not asked to instruct the jury to disregard it. That was not necessary under the circumstances. The record clearly indicates that all parties assumed that the statement was retracted and that the jury was therefore expected to disregard it. Certainly that incident could not prejudice the jury. It was not reversible misconduct.

The only other assignment of misconduct occurred when the prosecuting attorney, in his argument to the jury, was commenting on the reliance upon the fairness of the judge in pronouncing judgment in the event of a conviction. After stating that "the court, . . . [when the circumstances justified it], has paroled quite a number," he said "And if this young man were found guilty he [the Judge] might parole him." The defendant's attorney assigned that statement as an infringement of the court's province, and as prejudicial misconduct. The prosecuting attorney promptly replied that he did not pretend to say "what the Court might do"; that he was merely "talking about this parole proposition" generally. The court instructed the jury to disregard the statement. He said "The jury will disregard any comments on punishment." The jury could not have misunderstood that all parties concerned recognized the fact that the granting of parole and the punishment for a crime were solely within the province of the court. The prosecuting attorney specifically admitted that fact. Of course that reference to the possibility of parole was not warranted. It might be taken as an inducement to find the defendant guilty. But the error and misconduct were counteracted by the court's prompt admonition to disregard it. It was not reversible error under the circumstances of this case.

There was no miscarriage of justice in this case.

For the reasons previously stated, the motion for a new trial was properly denied.

 The court did not err in summarily denying defendant's motion for probation under section 1203 of the Penal Code. The statute specifically gives the trial court that discretion, under the circumstances of this case. (*People* v. *Darrow*, 212 Cal. 167 [298 P. 1]; Pen. Code, § 1203.) The section last cited provides in part that:

"After the conviction by plea or verdict of guilty of a public offense, . . . upon application of the defendant or of the people or upon its own motion, *may summarily deny probation*, . . . further provided, however, that *probation shall not be granted* to any defendant who shall have been convicted of robbery, burglary, . . . nor to one who in the perpetration of the crime of which he was convicted *inflicted great bodily injury* or torture, . . ." (Italics added.)

In the Darrow case. *supra*, the Supreme Court held that the trial court properly denied defendant's petition for probation without a hearing because the crime of murder, of which the defendant was convicted, as well as all crimes in which great bodily injury is inflicted, is specifically excluded from the benefits of section 1203 of the Penal Code. In that case the defendant was charged with murder in the perpetration of abortion. He was convicted of murder of the second degree. A petition for probation was summarily denied. The Supreme Court said that since the *intent* to commit the crime of abortion "was present," and the judge had heard the evidence at the trial, a separate hearing on the petition for probation was not necessary. The court said:

"In the commission of that crime, the intent was present. The criminal act resulted in the infliction of great bodily injury, death, . . . The statute [§ 1203 of the Penal Code], before amended to its present form to include those who in the perpetration of the crime have inflicted great bodily injury or torture, specifically excluded those who had committed murder from its provisions. Each case is to be adjudged by its own facts, and, in the instant case, the trial judge who heard the case had determined that it is not a case in which probation should be granted."

The cases of *People* v. *Jones*, 87 Cal.App. 482 [262 P. 361], and *People* v. *Lovelace*, 97 Cal.App. 228 [275 P. 489], relied upon by the appellant, are not in conflict with what we have previously said regarding the summary denial of a petition

for probation. In the Jones case the defendant was convicted of embezzlement. Embezzlement is not one of the crimes exempted from the benefit of probation under section 1203 of the Penal Code. That case, therefore, has no bearing on the issue in this case regarding the discretion of the trial court to summarily deny a petition for probation. In the Lovelace case the defendant pleaded guilty of *involuntary* manslaughter. In that case it does not appear, as it does in the present case, that great bodily injury was *intentionally* inflicted in the commission of the involuntary manslaughter. Quoting with approval from *People* v. *Kelley,* 24 Cal.App. 54 [140 P. 302], the court said, " 'Involuntary manslaughter, *as the phrase necessarily imports* and as our code defines that crime, is the taking of life in certain unlawful ways without any intention of doing so.' " (Italics added.) Involuntary manslaughter is clearly distinguishable from voluntary manslaughter committed in the heat of passion or even upon a sudden quarrel. (Pen. Code, § 192.) The court recognizes that distinction in the Lovelace opinion when it says:

"It follows that within the meaning of the statute in question one who in the perpetration of a crime inflicts great bodily injury must do so wilfully and intentionally (expressly or impliedly) before the substantial rights relating to probation, to which, under the terms of the statute, he is entitled, will be denied him."

In the Lovelace case it appears that the act of the defendant which led to his conviction of involuntary manslaughter was not a wilful, intentional assault upon another person, as it was in this case. It was an act performed, as the court states, "without due care and circumspection." At page 234 the court said:

"It may, therefore, be considered as established by judicial decision, as well as by statute, that in cases of involuntary manslaughter (especially where, as here, the crime was committed 'without due care and circumspection') no intention to commit the act *may be even imputed* to the guilty person."

That language does not apply to voluntary manslaughter. ■ It is true that in the commission of involuntary manslaughter accomplished while performing "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection," as it did in the Lovelace case, the *intention* to inflict "great bodily injury" may not be presumed. But that situation does not apply to the present

case in which the defendant was convicted of a wilful and unprovoked assault upon the deceased. If one wilfully and violently assaults another without cause, with the evident purpose of inflicting bodily injury, he must be presumed to intend the natural consequences of his unlawful act. (7 Cal. Jur. 853, § 13; 8 Cal.Jur. 25, § 144; Code Civ. Proc., § 1962.) It has been frequently held that an assault by means of force likely to produce great bodily injury may be accomplished by use of the fists only, without employing a deadly weapon. (*People* v. *Bumbaugh*, 48 Cal.App.2d 791, 797 [120 P.2d 703]; *People* v. *Kimmerle*, 90 Cal.App. 186, 189 [265 P. 525]; *People* v. *Nudo*, 38 Cal.App.2d 381 [101 P.2d 162]; *People* v. *Blake*, 129 Cal.App. 196, 205 [18 P.2d 399]; *People* v. *Hinshaw*, 194 Cal. 1, 17 [227 P. 156]; 3 Cal.Jur. 202, § 19; 6 C.J.S. 937, § 79b.)

The Supreme Court in the Darrow case distinguished it from the Jones and Lovelace cases, upon which the defendant in this case relies, by saying:

"*People* v. *Jones*, 87 Cal.App. 482 [262 P. 361], and *People* v. *Lovelace*, 97 Cal.App. 228 [275 P. 489], are not in point in fact and cannot rule the decision in the instant case."

On principle, we think the Darrow case is controlling of the issue in this case with regard to the right of the trial court to summarily deny the petition for probation, wherein the defendant was convicted of manslaughter as a result of a deliberate, wilful and intentional assault upon another person, necessarily constituting voluntary manslaughter. Indeed, the statute appears to specifically exclude such a case from the benefit of probation. The trial judge had heard all the evidence and he was perfectly familiar with the facts. He knew that the offense of which the defendant was convicted was not involuntary manslaughter. We must assume that the court so determined in summarily denying the petition for probation. A rehearing of the evidence adduced at the trial would furnish the judge with no further facts distinguishing the offense from involuntary manslaughter. A hearing upon the petition would be idle and useless. The statute authorizes the summary denial of a petition for probation under the circumstances of this case.

The judgment and the order are affirmed.

Adams, P. J., and Peek, J., concurred.