EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CRUZ FIGUEROA GUZMÁN, acusado y apelante.

Número 16325.

*Sometido:* 21 de enero de 1958. *Resuelto:* 21 de mayo de 1958.

---

*Miguel A. Ruiz,* abogado del apelante; *Hon. Secretario de Justicia J. B. Fernández Badillo, Arturo Estrella, Secretario Auxiliar de Justicia* y *Alfredo Archilla Guenard* y *William Fred Santiago, Fiscal* y *Fiscal Auxiliar del Tribunal Supremo,* respectivamente, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

Cruz Figueroa Guzmán fué procesado criminalmente ante el Tribunal Superior, Sala de Ponce, bajo la siguiente acusación:

"El Fiscal formula acusación contra Cruz Figueroa Guzmán, allá en o por el día 20 de agosto de 1956, y en Juana

Díaz, Puerto Rico, dentro de la jurisdicción de El Tribunal Superior de Puerto Rico, Sala de Ponce, allí y entonces, dicho acusado, ilegal, voluntaria y criminalmente, con malicia, premeditación y deliberación, demostrando poseer un corazón pervertido y maligno y con el propósito firme y deliberado de darle muerte ilegal a un ser humano, acometió y agredió con una manopla, instrumento contundente, al ser humano Raúl Enrique Torres Muñoz, a consecuencia de lo cual dicho Raúl Enrique Torres Muñoz recibió varias contusiones y fracturas, que fueron la causa directa de su muerte, ocurrida poco tiempo después."

Se le acusó también de portación ilegal de armas. Juzgado conjuntamente por tribunal de derecho, fué convicto de homicidio voluntario y sentenciado a cumplir una pena indeterminada de uno a cinco años de presidio con trabajos forzados. Fué absuelto de la acusación de portación ilegal de armas.

En su recurso contra el fallo condenatorio sostiene que "el veredicto no está sostenido por la prueba, la cual sólo sería suficiente para sostener una convicción por homicidio involuntario." Nos pide que rebajemos el fallo a homicidio involuntario fundándose en que "los hechos no autorizan en modo alguno que se infiera de ellos una intención de matar, porque no se usó arma alguna y el agresor, una vez dado el puñetazo, no siguió golpeando a su víctima."

Los hechos revelados por la prueba del Fiscal pueden resumirse así:

En la medianoche del 19 al 20 de agosto de 1956 el acusado Cruz Figueroa Guzmán y sus amigos Carlos Santiago, Ramón Feliciano, Eladín Reyes y Antonio Martínez regresaban hacia Ponce y desde un campo de Villalba donde habían celebrado una fiesta. Al pasar por la plaza de recreo de Juana Díaz, Antonio Martínez insultó a una mujer que se encontraba allí. La mujer se quejó a la policía y ésta, en un "jeep" salió en persecución de los viajantes dándoles alcance cerca del cementerio municipal de Juana Díaz. Allí se desmontaron de la guagua el acusado, Carlos Santiago

y Ramón Feliciano, entablándose conversación entre la policía y Cruz Figueroa Guzmán. Mientras ocurría esa conversación Eladín Reyes y Antonio Martínez súbitamente echaron a caminar la guagua y siguieron la marcha hacia Ponce, yéndose tras ellos la policía. El acusado y sus dos amigos, a su vez, emprendieron a pie la marcha en la misma dirección. Al tomar la guagua a gran velocidad una curva de la carretera cercana a un puente, se abrió la portezuela derecha desprendiéndose Antonio Martínez de su asiento cayendo sobre la carretera y fracturándose un brazo. La guagua, guiada por Eladín Reyes, siguió su marcha veloz sin ocuparse su conductor de auxiliar a Martínez. Cerca del sitio en que éste cayó, sentados en un muro del mencionado puente, se encontraban tocando una guitarra y cantando, Gumersindo Burgos, Pedro Hernández Cruz, Jesús Ramón Pagán y el soldado Raúl Enrique Torres Muñoz.

Al darse cuenta éstos de la caída de Antonio Martínez, lo recogieron y trataron de auxiliarlo. Varios conductores de automóviles que por allí transcurrían no quisieron detenerse para conducir al herido hasta un hospital de Ponce, pero al fin, el cuarteto consiguió uno dispuesto a llevar a Martínez al hospital. En los momentos en que lo montaban, llegaron al sitio, caminando a pie, el acusado Cruz Figueroa Guzmán, Carlos Santiago y Ramón Feliciano. Ninguno de éstos conocía a los del grupo que auxilió a Martínez. En torno a lo ocurrido a éste se trabó una discusión entre el acusado y Gumersindo Burgos, en el curso de la cual el acusado lanzó un puñetazo a Burgos; éste evadió el golpe, recibiéndolo en el pecho el soldado Raúl Enrique Torres Muñoz que se encontraba parado detrás de Burgos. Como resultado de esa agresión, el soldado cayó de espaldas sobre el pavimento de la carretera fracturándose el cráneo. Unas cuatro horas después, mientras era conducido hacia un hospital militar, falleció Torres Muñoz. En la misma noche el acusado se entregó a la policía de Juana Díaz.

Un doctor militar practicó la autopsia del occiso y en el juicio declaró que el cadáver no presentaba "ninguna señal en el cuerpo que hubiere sido agredido con una manopla o alguna arma contundente." [1]

La prueba de defensa, no creída por el juez sentenciador, consistió en las declaraciones del propio acusado, de Carlos Santiago y Ramón Feliciano. Estos dos fueron sus compañeros de caminata desde el cementerio de Juana Díaz hasta el puente. Sus testimonios tendieron a probar que cuando el acusado y sus amigos llegaron al grupo donde estaba el herido Martínez, el testigo del fiscal nombrado Gumersindo Burgos se hizo pasar por un policía, le dijo al acusado que estaba arrestado, le quitó la cartera y le dió una bofetada; que entonces se acercó el soldado Torres Muñoz, agarró por el brazo izquierdo al acusado y en ese instante éste le tiró un puñetazo a Burgos que fue a dar en el pecho del soldado cayendo Torres Muñoz al suelo; que al ocurrir esto, los demás acometieron con piedras al acusado y lo hicieron huir hacia una pieza de cañas.

---

[1] El certificado médico de la autopsia, suscrito por dicho doctor, admitido por el tribunal con la conformidad del acusado, entre otras cosas, dice textualmente:

"En General: El cuerpo es de un varón .blanco, joven, bien desarrollado y alimentado, que presenta rigidez cadavérica en la quijada pero no en las extremidades, . . . Presenta una abrasión, de un diámetro de 2.5 aproximadamente, sobre la protuberancia occipital. . . . CABEZA: El cutis sobre la protuberancia occipital presenta la abrasión mencionada anteriormente en este informe. . . . Hay una fractura lineal que se extiende desde la parte posterior de la fosa craneal posterior izquierda, a través del aspecto medial de esta fosa, hasta el antebrazo yugular izquierdo. No se observa desplazamiento ·de ningún hueso craneal. No hay ninguna otra fractura.

"RESUMEN

"Se trata en este caso de un varón joven, blanco, que según se dice recibió en la quijada un golpe del puño de un agresor y que al caer hacia atrás se hirió en la cabeza (porción posterior) en calle de cemento. Recibió asistencia médica y fué enviado en avión al Rodríguez Army Hospital, pero falleció antes de llegar al hospital. La muerte en este caso se atribuye a una lesión en la cabeza que le produjo hemorragia epidural, hemorragia subdural, contusiones cerebrales y hemorragia subaracnoidea focal. Se estima que los cambios pulmonares se produjeron como resultado de la lesión en la cabeza."

■ Se comete el delito de homicidio voluntario al darse muerte ilegal a un ser humano sin que medie malicia, con ocasión de una súbita pendencia o arrebato de cólera. Si la muerte ilegal sin malicia ocurre al realizarse un acto ilegal, que no constituyere delito grave; o al realizarse un acto legal que pudiera ocasionar muerte en forma ilegal, o sin la debida prudencia o circunspección, el delito cometido es el de homicidio involuntario.[2]

En el acto de dictar sentencia, entre otras cosas, dijo el juez sentenciador:

" . . . El Ministerio Público . . . no ha probado que estuviera (el acusado) portando arma alguna, ni el certificado médico demuestra que la víctima hubiera muerto a consecuencia directa del acometimiento por un arma mortífera. En la causa que sigue El Pueblo de Puerto Rico contra Cruz Figueroa Guzmán, por asesinato, el tribunal entiende que ningún ingrediente del delito de asesinato está presente en su modalidad clásica de asesinato, ni existe la malicia. Ahora, la corte tiene el convencimiento que Cruz Figueroa Guzmán es culpable de un delito de Homicidio Voluntario, y en su virtud así lo declara, culpable y convicto del delito de Homicidio Voluntario." (T. Ev. 73.)

La distinción básica entre el homicidio voluntario y el involuntario, según ha sido desarrollada por la doctrina legal, consiste en que en el voluntario se requiere la presencia de una intención de ocasionar la muerte de un semejante, mientras que en el involuntario la muerte se ocasiona sin la intención de matar.[3]

■ De la evidencia aportada por el fiscal ¿resultó probado, fuera de toda duda razonable, que el acusado agrediera

---

[2] Art. 203, Cód. Penal (33 L.P.R.A. sec. 635); *Pueblo* v. *Cruz*, 49 D.P.R. 653, 658 (1936); *Pueblo* v. *López*, 77 D.P.R. 607, 612 (1954).

[3] *Pueblo* v. *Cruz*, 49 D.P.R. 653, 658 (1936); *Pueblo* v. *Cortés*, 42 D.P.R. 923, 924 (1931); Cf. *Pueblo* v. *Méndez*, 74 D.P.R. 913, 931, 934 (1953); *People* v. *Pilgrim*, 73 Cal. App.2d 391, 166 P. 2d 636 (1946); *People* v. *Bender*, 27 Cal.2d 164, 163 P.2d 8 (1945); *People* v. *Ross*, 34 Cal.App.2d 574, 93 P.2d 1019 (1939); *People* v. *McManis*, 122 Cal. App.2d 891, 266 P.2d 134 (1954); *People* v. *Miller*, 114 Cal. App.

334

con el puño al soldado Torres Muñoz con la intención de causarle la muerte? Resolvemos que esa evidencia fué insuficiente para demostrarlo.

Todos los testigos presenciales que ofreció El Pueblo declararon que el acusado, no conforme con la explicación que le daba Burgos sobre lo ocurrido a Martínez, lanzó un puñetazo a Burgos y que al moverse éste para evitar el golpe, lo recibió el soldado Torres Muñoz que estaba muy cerca de Burgos, cayendo de espaldas sobre la carretera Torres Muñoz; que el acusado no le dió ningún otro golpe a Torres Muñoz, yéndose en seguida del sitio detrás del testigo Jesús R. Pagán.

El testigo principal de cargo, Gumersindo Burgos Santiago, cuando se le preguntó sobre el motivo que pudo haber tenido el acusado para lanzarle el puñetazo, declaró: "Creería él (el acusado) que aquel individuo que nosotros montamos en la guagua lo herimos nosotros." (T. E. pág. 44.)

Manifestó el juez sentenciador que el acusado no portaba arma alguna, ni actuó con malicia, en el momento de la agresión. El médico declaró que el cadáver de Torres Muñoz no presentaba ninguna señal en el cuerpo indicativa de haber sido agredido con una manopla o arma contundenté y atribuyó la causa de la muerte "a una lesión en la cabeza (parte posterior) que le produjo hemorragia epidural, hemorragia subdural, contusiones cerebrales y hemorragia subaracnoidea focal." Estas circunstancias no significan, sin embargo, que el acusado puede escapar de responsabilidad criminal. Ésta no depende del hecho de que la muerte sea la consecuencia inmediata de su conducta, si la agresión contribuyó inmediata o mediatamente a la muerte de Torres

293, 299 Pac. 742 (1931); *People* v. *Kelley,* 24 Cal. App. 54, 140 P. 302 (1914); 25 Cal. Jur. 2d, *Homicide,* secs. 125 y 134, 1 Warren *on Homicide,* 420, 422; 2 Burdick, *Law of Crime,* 200, 201, 1 Wharton's *Criminal Law,* 664; Moreland, *Law of Homicide,* pág. 64; Clark and Marshal, *A Treatise on the Law of Crime,* 5ta. ed. 1952, pág. 354; 38 Kentucky Law Review, *A Re-examination of the Misdemeanor Manslaughter Doctrine,* págs. 118–127; 40 C.J.S., *Homicide,* sec. 54; 26 Am. Jur., *Homicide,* secs. 18 y 44.

Muñoz.(⁴)   Aquí el apelante no trata de evadir su responsabilidad criminal; la acepta, pero no en la medida en que la fijó el juez sentenciador.   Su tesis es que el delito que cometió fué el de homicidio involuntario porque al agredir a Torres Muñoz no lo hizo con la intención de privarle de la vida.

No hemos encontrado en la prueba del fiscal circunstancia alguna de la cual razonablemente pueda inferirse que el acusado agredió al soldado con la intención de matarlo. Golpear con el puño en el pecho, una sola vez, a una persona adulta, saludable, y en circunstancias ordinarias, no puede considerarse peligroso, o susceptible de producir la muerte o grave daño corporal.(⁵)   La inferencia de una intención homicida está justificada cuando una agresión con los puños se descarga en forma brutal, violenta y viciosa sobre una parte vital y delicada del cuerpo humano; cuando el agresor se aprovecha de la indefensión del agredido, toma ventaja de su corpulencia sobre la víctima y la castiga con extrema crueldad en un temerario desprecio por la seguridad humana, o en tal forma que el resultado natural, ordinario y probable es la muerte del semejante agredido.   En estos casos las manos y los pies se equiparan a un arma mortífera.(⁶)

Aunque el golpe con el puño produjo la caída al suelo del soldado, sin embargo, según el médico, no dejó rastro alguno de lesión en el pecho de Torres Muñoz.

Los testigos de cargo Burgos y Pagán declararon que el acusado, antes de acometer al primero de ellos, dijo: "que *nos retirásemos* porque uno de nosotros iba a fallecer y que él lo mismo cogía la cárcel que el cementerio y *fingió sacar*

---

(⁴) 26 Am. Jur., *Homicide*, sec. 48.

(⁵) *People* v. *Chutuk*, 124 Pac. 566;   *People* v. *Bones*, 170 P. 166; *Roark* v. *Commonwealth*, 28 S.E.2d 693;   *Kearns* v. *Commonwealth*, 49 S.W.2d 1009;   *Thomas* v. *Commonwealth*, 86 S.W. 694;   *People* v. *Hodges*, 85 P.2d 443;   *State* v. *Cobo*, 60 P.2d 952;   *Ketring* v. *State*, 200 N.E. 212; *Sikes* v. *Commonwealth*, 200 S.W.2d 956.

(⁶) Véase *Commonwealth* v. *Buzard*, 365 Pa. 511 (1950) y la monografía publicada en 22 A.L.R.2d 854–874.

*algo del bolsillo*. . . ." Esas frases, pronunciadas por una persona desarmada, posiblemente cansada por los efectos de una larga fiesta y una larga caminata, dirigidas a un grupo de otras cuatro personas que, aunque también desarmadas podían repeler cualquier ataque con los puños, no pasaban de ser una fanfarronada, propias de uno que se jactaba de ser un boxeador. Todos se quedaron allí sin tomar en cuenta la orden del acusado para que se retirasen. Éste lanzó el golpe con su puño para agredir a Burgos, no al soldado Torres Muñoz.[7] Burgos declaró: " . . . y cuando él me tiró yo brinqué a evitar ser agredido y el soldado que estaba al lado mío . . . se quedó parado." (T.E. pág. 41.) "Yo me previne. El soldado no." (T.E. pág. 46.) El juez sentenciador consideró que las palabras del acusado fueron un "anuncio que él hizo." (T.E. pág. 41.) Esa conducta del acusado no es un seguro indicio del estado mental que caracteriza al homicida voluntario.[8]

La contención del fiscal en este recurso es que de las circunstancias del caso de autos se desprende, no solamente que el acusado tuvo la intención específica de matar al soldado, sino que actuó entonces con malicia y que debió haber sido convicto de un asesinato en segundo grado. Cita en apoyo de su teoría, principalmente, los casos de *State* v. *García,* 299 P.2d 467 (1956), *State* v. *Sayles,* 155 N.W. 837 (1916) y *Boggs* v. *Commonwealth,* 148 S.W.2d 703 (1941). Ninguno de esos casos tiene analogía substancial con el de autos.

En el caso de *García,* procedente de la Corte Suprema de Nuevo Méjico, el acusado fué convicto de asesinato en segundo grado. En su recurso de apelación sostuvo que la

---

[7] Bajo la doctrina de la intención implícita o intención transferida —que ha sido objeto de mucha controversia y distinciones, 1 Wharton's *Criminal Law,* 194, escolio 8—debemos considerar que el acometimiento se realizó contra el soldado Torres Muñoz. —Art. 51, C. Penal 33 L.P.R.A. sec. 97; *Pueblo* v. *Colón,* 65 D.P.R. 760, 766; *Pueblo* v. *Cartagena,* 54 D.P.R. 870, 877; *Pueblo* v. *Cabán,* 45 D.P.R. 217; *Pueblo* v. *Estrella,* 42 D.P.R. 342; *Caballero* v. *Pueblo,* 36 D.P.R. 67, 69; *Pueblo* v. *Rivera,* 36 D.P.R. 194.

[8] Cf. *Falero* v. *Calzada, Alcaide,* 38 D.P.R. 647, 649.

evidencia era insuficiente para declararlo convicto de ese delito fundándose en que no se estableció por la misma la premeditación o la intención de matar, ni tampoco la malicia. Los hechos pertinentes del caso, sintetizados, son los siguientes: Joe Leandro García, el acusado, estaba molesto porque su primo Leo García se había mezclado en sus aventuras amorosas. Como a las tres de la madrugada del día 13 de junio de 1954, Joe indujo a Leo, mientras éste se encontraba en estado de embriaguez, a que se montara en su carro y siguieran de fiesta. El acusado increpó a su primo por intervenir en sus asuntos y lo provocó diciéndole que lo iba a ajustar con una serie de golpes. Se fueron a un callejón y por espacio de unos veinte o veinticinco minutos estuvo el acusado golpeando brutalmente a su primo con algo que, según el médico que declaró en el juicio, pudo ser un instrumento contundente, como un zapato grueso, una vara, un "bate" de jugar pelota o un pedazo de roca. Le ocasionó entre treinta y cuarenta lesiones serias, entre ellas, la rotura de la vena cava por el sitio donde se une con el riñón izquierdo, la rotura del intestino pequeño y el destrozo de cinco costillas. Le ocasionó otras contusiones en la cadera derecha, pecho derecho, brazos, abdomen y cabeza; le produjo pequeñas hemorragias en la cubierta del cerebro. La causa próxima de la muerte de Leo García, que ocurrió pocas horas después de ese salvaje castigo, fué la rotura de la vena cava y la abundante hemorragia interna consiguiente, las lesiones cerebrales y la rotura de las costillas. Causa eficiente fué la rotura del intestino pequeño que ocasionó peritonitis.

La Corte Suprema de Nuevo Méjico resolvió que los hechos del caso constituían suficiente base para probar la existencia de premeditación, malicia e intención de privar la vida de un semejante.

En el caso de *Sayles*, éste había amenazado de muerte a la víctima, tuvo una pelea con ésta, volvió al sitio y le propinó un solo golpe tan fuerte que lesionó la laringe de la víctima falleciendo ésta de asfixia. El tribunal de Iowa

resolvió que por la violencia del golpe y la parte delicada del cuerpo en que se dió, podía inferirse que el acusado golpeó a su víctima con la intención de privarle de su vida, con malicia y premeditación.

En el de *Boggs* se sostuvo el veredicto de homicidio voluntario porque de la violencia del solo golpe recibido por la víctima, de las admisiones del acusado luego de ser enterado de que había muerto la persona agredida por él, y de haber utilizado una manopla de acero para herir en la cabeza a la víctima—aunque la evidencia sobre este punto fue débil— el jurado estuvo justificado en inferir la existencia de una intención homicida.

La presunción controvertible de que toda persona intenta la consecuencia *ordinaria* de un acto cometido por ella voluntariamente, (⁹) no tiene aplicación al caso de autos. La muerte, generalmente, no puede considerarse la consecuencia ordinaria, natural y probable de una agresión con el puño y en el pecho de una persona joven y saludable. No hay razón para suponer que el agresor consideraba que el acto que se proponía ejecutar o el que ejecutó tendía a destruir la vida o que tal resultado razonablemente podía anticiparse. (¹⁰)

El apelante, en un impulso momentáneo, irreflexivo y precipitado realizó un acto ilegal al golpear, con su puño,

(⁹) Art. 102(3) Ley de Evidencia, 32 L.P.R.A. sec. 1887.

(¹⁰) *People* v. *Crenshaw*, 131 N.E. 576 (1921); *People* v. *Mighell*, 98 N.E. 236. En la declaración jurada prestada por el acusado ante el fiscal Veray, horas después del suceso, que fue ofrecida por El Pueblo como evidencia, expresó el acusado que tiró el puño en defensa propia. (T.E. 85.) En el juicio, cuando se le preguntó si había tirado "ese puño . . . con el fin de matar a alguno," contestó: "Con el fin de defenderme." (T.E. pág. 53.)

Los tratadistas americanos más acatados repudian, por ilógica y severa, y por haber ocasionado gran incertidumbre y confusión en el derecho penal, la regla de los códigos que establece la clasificación de los delitos de asesinato y homicidio a base de si el acto ilegal subordinado es o no un delito *felony* o *misdemeanor*. Insisten en que la responsabilidad criminal en estos casos debe descansar no en la legalidad o ilegalidad del acto en el transcurso del cual ocurre la muerte, sino

al soldado, que constituyó un delito de acometimiento y agresión simple.([11])   Pero al agravarse el acto ilegal con la infortunada e imprevista muerte accidental del agredido, el delito finalmente cometido resultó ser el de homicidio involuntario definido por el art. 203 de nuestro Código Penal, y por consiguiente *procede que se deje sin efecto la sentencia apelada; declarar al acusado culpable y convicto del delito de homicidio involuntario y devolver el caso al Tribunal Superior, Sala de Ponce, para que se dicte nueva sentencia por este delito contra el acusado, todo de conformidad con la presente opinión.*

en si el mismo era lo suficiente peligroso en sí para justificar una convicción de asesinato u homicidio, según el caso.   La doctrina del acto ilegal debe fundamentarse en la cuantía de peligrosidad inherente del acto realizado, y que éste sea la causa próxima de la muerte.   Sostienen que la regla (*test*) en todos estos casos ᛫debe ser el criterio usual para la negligencia criminal: ¿equivale la conducta del acusado a un manifiesto desprecio temerario de la seguridad y la vida humana bajo las circunstancias?   Moreland, *The Law of Homicide,* 1952, págs. 183, 192, 194 y 195.   Cf. *Pueblo* v. *López,* supra.

