EL PUEBLO DE PUERTO RICO, apelado, *v.* TOMÁS DIEPPA BEAUCHAMP, acusado y apelante.

*Número:* CR-83-13     *Resuelto:* 3 de abril de 1984

*N. Torres Marrero,* abogado del apelante; *Miguel Pagán, Subprocurador General,* y *Miguel A. Santana Bagur, Procurador General Auxiliar,* abogados de El Pueblo.

## SENTENCIA

Acusado de un delito de homicidio por causar la muerte de un ser humano al propinarle un golpe en la barbilla en ocasión de súbita pendencia o arrebato de cólera, el jurado rindió veredicto de culpabilidad contra el apelante por el delito de homicidio involuntario. Fue condenado a cumplir una sentencia de seis meses de cárcel con el beneficio de una sentencia suspendida.

En apelación impugna el veredicto porque a su juicio la identificación que se hiciera en la rueda de detenidos no fue confiable y de que su prueba de coartada es creíble. El apelante, además, señala en el escrito de apelación otros dos errores que no consideraremos porque no tenemos el beneficio de su discusión. En su alegato, el apelante se limita a repetir los dos señalamientos sin discutirlos. Nos referimos al señalamiento de que se provocaron innumerables recesos en el juicio sin decirnos cómo se afectaron los derechos del apelante, y que no se diera una instrucción sobre un posible veredicto de agresión. Recordamos a este respecto que en *Pueblo* v. *Figueroa,* 80 D.P.R. 328, 338–339 (1958), se expresó:

El apelante, en un impulso momentáneo, irreflexivo y precipitado realizó un acto ilegal al golpear, con su puño, al soldado, que constituyó un delito de acometimiento y agresión simple. Pero al agravarse el acto ilegal con la infortunada e imprevista muerte accidental del agredido, el delito finalmente cometido resultó ser el de homicidio involuntario defi-

nido por el Art. 203 de nuestro Código Penal, . . . . (Escolio omitido.)

Con respecto a la identificación del apelante, el alegato del Procurador General disipa cualquier duda que pudiera haber sobre la confiabilidad del procedimiento utilizado. Transcribimos del mismo a continuación.

Luego de una investigación practicada por el agente investigador de la Policía, Pedro J. Rivera, el día 9 de agosto de 1982 se celebraron las ruedas de detenidos ("lineups") donde el acusado fue identificado. Al momento de celebrarse la rueda de detenidos el acusado estaba representado por su abogado, Lic. Nicolás Torres Marrero. Además, estaban presentes allí el Fiscal Warren Vázquez y el Oficial Comandante de la Armada de los Estados Unidos en los Cuarteles del Caribe, Paul Lawrence Teare. Ese día se celebraron inicialmente cinco ruedas de detenidos, una por cada uno de los marinos que figuran como testigos del Pueblo en la acusación. El acusado fue presentado en la rueda junto a otros sospechosos. Ninguno de los cinco marinos pudo inicialmente identificar al acusado en la primera rueda de detenidos que se celebró.

No obstante, el marino Mariano P. Roa, Jr., al salir del cuarto de identificación, le comentó al Comandante Teare que "[e]l que le había dado el puño a Jones estaba en ese grupo, pero que dijo que no lo había visto, porque quería estar positivo y que estaba nervioso." (E.N.P., pág. 5). Igualmente, el testigo Robert Scott McNight le informó al Comandante Teare que había visto al acusado en la rueda, pero que no se atrevió a indicarlo al agente porque quería estar seguro (E.N.P., pág. 10). Ambos marinos dijeron entonces que quizás en un segundo "lineup" podían hacer una identificación.

Se celebró entonces una segunda rueda de detenidos donde participaron como testigos de identificación los marinos Roa y McNight. En esta segunda rueda Roa identificó al acusado como el autor de los hechos, pero McNight no lo pudo identificar "porque estaba nervioso por las preguntas que le hacía el abogado y quería estar seguro." (E.N.P., pág. 10).

Durante el juicio tanto Roa como McNight identificaron al acusado como el autor de los hechos delictivos. (E.N.P., págs. 2, 7 y 10).

El apelante se queja de la forma en que fue identificado y

alega que hubo presiones por parte del Fiscal Vázquez para que se celebrara la segunda rueda de detenidos. Ello es totalmente incorrecto pues la segunda rueda se celebró a instancias de los propios testigos Roa y McNight, quienes querían estar seguros de que podían hacer una identificación correcta. Debe considerarse aquí que los testigos habían estado sujeto[s] a grandes presiones, ya que los hechos ocurrieron el mismo fin de semana que mataron a cuatro marinos frente al Club Náutico y ellos tenían miedo de que también los mataran. (E.N.P., pág. 12).

En ningún momento el Ministerio Público ni oficial alguno de la Policía presionó a los testigos para que éstos identificaran al acusado. El testigo Roa lo identificó en la segunda rueda luego de manifestar que lo había identificado en la primera rueda pero que quería estar seguro. Roa tuvo amplia oportunidad para observar al acusado la noche de los hechos pues cuando ocurrió el incidente con el marino Jones, él se dirigió a la puerta de salida del negocio y pudo ver de cerca al acusado cuando éste le dio el puñetazo a Jones en la cara. (E.N.P., págs. 2 y 4). También el testigo McNight observó al acusado desde bien cerca la noche de los hechos, pues estuvo discutiendo con él cuando éste llevaba a Jones para sacarlo fuera del negocio. El acusado empujó entonces a McNight y le dio el puño en la cara a Jones. (E.N.P., pág. 7). Alegato del Procurador General, págs. 3–5.

Estamos convencidos de que el procedimiento de identificación cumple con las exigencias del debido proceso.

La prueba de coartada no fue creída por el jurado y nada se aduce para justificar que intervengamos con la discreción así ejercitada.

Se confirma la sentencia apelada.

Así lo pronunció y manda el Tribunal y certifica la Secretaria. El Juez Asociado Señor Dávila emitió opinión disidente a la cual se unió el Juez Asociado Señor Irizarry Yunqué. El Juez Presidente Señor Trías Monge disiente sin expresión.

(*Fdo.*) Lady Alfonso de Cumpiano
*Secretaria General*

—O—

Opinión disidente emitida por el Juez Asociado Señor Dávila
a la cual se une el Juez Asociado Señor Irizarry Yunqué.

Disiento. Al enfrentarnos a casos como el que ahora consideramos debemos tener presente lo expresado en *Pueblo* v. *Gómez Incera*, 97 D.P.R. 249, 252–254 (1969), al efecto de que:

> No puede haber un juicio justo e imparcial si no se garantiza debidamente la forma de identificar a la persona que se acusa de la comisión de un crimen. Los mayores extravíos en la administración de la justicia lo ocasionan los errores en la identificación de los acusados. Se apunta que en un estudio de sesenta y seis casos resueltos, en veintinueve de ellos se identificó erróneamente al acusado. Ver Borchard, *Convicting the Innocent* (Garden City, 1932); Williams & Hammelmann, *Identification Parades-I*, 1963, Crim. L. Rev. 479.
> En el último artículo citado se expresa:
> "Las razones del peligro de esta clase de evidencia no son difíciles de descubrir. Evidencia de identificación es la evidencia de opinión por excelencia, es la clase de prueba de la cual el derecho inglés, siempre se ha protegido con singular cuidado. Como los Jueces Evatt y MacTiernan comentaron en el caso australiano de *Craig*, 'Un testigo honesto que dice 'El acusado es el hombre que guiaba el carro,' lo que aparenta ser una simple, clara e impresionante aseveración, realmente está asegurando: (1) que él observó al conductor, (2) que lo que observó, quedó grabado en su mente, (3) que él todavía retiene esta impresión original, (4) que tal impresión no ha sido afectada, alterada o reemplazada, por las fotografías publicadas del acusado y (5) que el parecido entre la impresión original y el acusado es suficiente para concluir que no es un parecido sino una identificación.' La complejidad de esta controversia se confunde cuando al testigo se le pregunta, como comúnmente se hace, ya sea por el fiscal, o por el juez: '¿Ve usted hoy en corte el hombre de quien usted habla?' La contestación a esta pregunta, con un gesto en dirección al banquillo de los acusados es una conclusión esperada: resulta poco plausible e impresiona al jurado, y sin

embargo la cuestión de si el testigo reconoce ahora al acusado como el criminal es de tan poca fuerza probatoria que sería mejor que no se le preguntara, excepto en el contexto de otras tres preguntas: ¿cuándo y en qué circunstancias reconoció el testigo por primera vez al acusado como el hombre?; ¿si tuvo alguna dificultad en reconocerlo?; ¿y por qué rasgos lo identificó? Aún estas preguntas adicionales puede que no salven esta clase de evidencia del peligro de confundir a los jurados, pero al menos brindarán alguna oportunidad de revelar faltas en la identificación."

Ver además Gorphe, *"Showing Prisoners to Witnesses for Identification"*, 1 American Journal of Police Science, 79 (1930); *United States* v. *Wade*, supra, a la pág. 228

Conociendo los errores que se pueden cometer en la identificación de una persona que sólo ha sido observada por tiempo limitado, en circunstancias de tensión y nerviosismo que necesariamente afectan el sentido de percepción, esta fase del proceso investigativo debe rodearse con las salvaguardas necesarias que eviten que se malogre la justicia. No se debe depender de la identificación que pueda hacer en corte el día del juicio. La identificación en el juicio estaría maculada por los vicios de que adoleció la llevada a cabo en la etapa investigativa. Ver *People* v. *Caruso*, supra; IV Wigmore, *On Evidence*, Sec. 1130 (ed. 1940). Los testigos ya habían determinado que el acusado era el responsable. La identificación durante el juicio resulta una mera formalidad. Como se expresó en el artículo escrito por Williams and Hammelmann, *supra*, y que se cita en *Wade* a la pág. 229: "La experiencia ha demostrado que una vez un testigo señala al acusado en la confrontación, no es de esperarse que se retracte más tarde, de tal manera que en la práctica la controversia de la identificación puede (en la ausencia de otra evidencia relevante) para todos los propósitos prácticos ser determinada en ese momento, antes del juicio . . . ."

Procede analizar la prueba. Un marino de apellido Jones, al ser expulsado por una persona del club nocturno La Riviera, luego de un día de fiesta, recibe un golpe en la quijada, rodando escaleras abajo. Los golpes sufridos al caer le ocasionaron la muerte. A Jones le acompañaban varios

marinos. Sólo uno de ellos "identifica" al apelante. Su apellido es Roa. Declaró "que abandonó el barco alrededor de las dos de la tarde y se fue por la ciudad de San Juan visitando varios bares, que estuvo de bar en bar y a eso de las siete a ocho de la noche se fue con unos amigos para la 'Riviera Night Club', que se sentó en el 'counter' de una de las barras de la Riviera donde consumieron bebidas alcohólicas; había mujeres 'a go-go' bailando, y entre ocho y nueve de la noche vio a su amigo Tibby Jones [la víctima] a quien conocía desde agosto de 1981; describe a Jones como un joven delgado de más o menos de cinco pies y seis pulgadas de alto y ciento treinta y cinco de peso; que vio a Jones cuando caminaba por detrás del 'counter'; que lo vio cuando él (el testigo) por curiosidad miró hacia atrás, pues él tiene el hábito de mirar para todos los lados; que luego vio al acusado (al cual identificó en corte abierta), dirigirse a donde estaba Jones y lo agarró por los brazos y le dijo que se saliera del bar; que Jones rechazó al acusado y trató de deshacerse de él, pero como era más chiquito no podía soltarse; Jones no quería irse del bar; el acusado lo empujó hacia la salida caminando una distancia de quince a veinte pies; mientras tanto él seguía bebiéndose una cerveza y no vio lo que sucedía cuando se acercaron a la puerta de salida; luego oyó unos gritos y vio alguna gente que se mov[ía] hacia la puerta; entonces él también se dirigió hacia la puerta de salida y vio otra persona bloqueando la salida; esa persona no está en la sala; pudo apreciar que la puerta es de cristal y cuando se acercó a la misma vio al acusado y a Jones argumentando mientras el acusado aguantaba a Jones por el brazo; Jones estaba de frente; allá también estaba el marino McNight a la parte izquierda de donde estaban Jones y el acusado; que Jones trataba de zafarse; entonces el acusado empujó a McNight y le dio a Jones un puño en la cara; Jones estaba cerca del escalón superior de la escalera; el golpe que recibió Jones fue fuerte y brincó cuatro o cinco escalones hasta caer; el golpe fue en la quijada izquierda; cuando

Jones cayó, el testigo le dijo a la persona que lo bloqueaba que lo dejara pasar; la persona que estaba en la puerta lo dejó pasar y Jones estaba en el fondo de la escalera, respirando fuerte; Jones no podía hablar; tenía los ojos abiertos y botaba sangre por la cabeza; McNight estaba allá y ayudó a Jones a trasladarlo al barco; él regresó a la barra y no sabe lo que pasó después". E.N.P. enmendada, págs. 1–2.

En cuanto a cómo se llevó a efecto la identificación del apelante el testigo Roa manifiesta "que compareció el día 9 de agosto de 1982, al Cuartel de la Policía para rueda de detención de sospechosos. Dice que él fue el primero en participar; se le mostraron los retratos tomados durante el proceso del 'line up'. Dice que fue el primero en participar en dicho 'line up', en el cual hab[ía] otras personas. Explica el proceso anterior al 'line up', declarando que el oficial que dirigía el 'line up', le hizo advertencias bien claras en cuanto a la seguridad de la identificación; mientras estaba observando la rueda de detención, al lado de él estaba el Comandante Teare, además del Fiscal Vázquez, el oficial que dirigía el 'line up' y el abogado del acusado; declara que estaba bien consciente de lo que hacía y que estuvo el tiempo suficiente para estar seguro de la identificación; pues tenía claro en la mente todas las instrucciones que al respecto le había hecho el oficial que dirigía el proceso del 'line up'; que los sospechosos, a indicaciones de él, adoptaban distintas posiciones: de frente, de perfil, y de espaldas, y luego extendían los brazos hacia el frente a indicaciones del testigo durante algún tiempo moviendo los brazos en distintas posiciones para asegurar la identificación; que en el 'line up' donde estaba el acusado hab[ía] cuatro a cinco personas más; que él estuvo observando detenidamente a todas ellas incluyendo al acusado, no identificando al acusado como la persona que intervino en el incidente con su amigo Jones[;] que al salir del cuarto de identificación, le comentó al Comandante Teare, que el que le había dado el puño a Jones estaba en ese grupo, pero que dijo que no lo había visto, porque quería estar posi-

tivo y que estaba nervioso. Que le explicó eso al Comandante Teare. Que luego que se terminaron los 'line ups', que fueron [de] cuatro a cinco en total y en los cuales sus compañeros McNight, Mulligan, Shibes y Godsey no pudieron tampoco identificar al acusado, a él y a McNight lo[s] sometieron en horas de la tarde a una serie de 'line ups', entre los cuales identificó al acusado. Que se enteró que McNight, también fue sometido a 'line up', pero no pudo identificar al acusado. También declaró que él había tomado tres cervezas en la tarde y había comido en la noche del 14 de mayo de 1982; por lo que pudo apreciar bien lo que aconteció en La Riviera y en la escalera del negocio. Que aunque beba el sentido de percepción y de observación no se le afecta. Declaró además que había tomado antes de llegar a La Riviera y que había comido; declaró que McNight estuvo más de cerca al acusado que él durante el incidente del golpe". E.N.P. enmendada, págs. 4–6.

En *Pueblo* v. *Peterson Pietersz*, 107 D.P.R. 172 (1978), expresamos que al calibrar la confiabilidad de una identificación debíamos tomar en consideración ciertos indicadores de suficiencia y confiabilidad a que hizo referencia el Tribunal Supremo de los Estados Unidos en *Neil* v. *Biggers*, 409 U.S. 188, 199 (1972) y *Manson* v. *Brathwaite*, 432 U.S. 98 (1977). Estos indicadores son: (1) oportunidad de observar; (2) grado de atención; (3) fidelidad de la descripción; (4) nivel de certeza y (5) tiempo entre el crimen y la confrontación.

Antes de considerar la prueba a la luz de estos indicadores, procede consignar que en todo el proceso de identificación estuvo junto a los cinco marinos su oficial comandante y que éstos sentían la obligación de explicarle que tenían dificultad en identificar al causante del daño.

Veamos cuál es la situación con el marino Roa, quien identificó al apelante. Admite que estuvo bebiendo toda la tarde, que al llegar a La Riviera continuó bebiendo y que al comenzar el incidente que terminó en tragedia estaba de

espaldas, pero miró hacia atrás y continuó bebiendo y no es hasta que surge el incidente final en la escalera que se levanta y a través de un cristal, en ambiente de obscuridad, que puede apreciar entre un grupo de personas, quién propinó el golpe que hizo rodar a Jones escaleras abajo. Sin embargo, declaró que el marino McNight estaba más cerca y junto a Jones en la escalera, pero éste no pudo identificar al apelante en dos ruedas de detenidos. Esto a pesar de haberle indicado al comandante en la primera ocasión que no había podido identificar al autor del delito, pero que sabía que estaba en la rueda. En la segunda oportunidad tampoco pudo identificar al apelante. Luego de ocurrida la desgracia, la víctima fue llevada al barco y Roa regresó a la barra.

Es evidente que este testigo que se pasó bebiendo toda la tarde y que continuó ingiriendo bebidas alcohólicas en La Riviera, no podía estar en condiciones de percibir y grabar en su mente la fisonomía de la persona que agredió a Jones y especialmente cuando los hechos ocurrieron en horas de la noche, en un establecimiento mal alumbrado con poca visibilidad. Cuando se inició el incidente dentro del negocio en el que Jones era llevado por un brazo, según Roa, miró hacia atrás, pero siguió bebiendo y no fue sino hasta que oyó un alboroto en la escalera que se levantó y a través del cristal de la puerta observó lo que ocurría en la escalera. Arroja sospechas la inmutabilidad de Roa al seguir bebiendo a pesar de que su amigo tenía problemas. Esta conducta confirma su estado de ebriedad.

Es razonable concluir que dado el estado de ebriedad en que estaba, su colocación y la obscuridad del lugar, Roa no tuvo la oportunidad de observar adecuadamente y que no prestó un grado de atención suficiente. Lo demuestra el hecho de que al comenzar el incidente continuó bebiendo, y que luego del incidente final regresa a la barra. El hecho de que tardara tanto en identificar al apelante y que en todo momento del proceso de identificación estuviera bajo la

supervisión de su comandante, indican ciertamente que el nivel de certeza era de dudosa confiabilidad. Y si a esto añadimos que los otros marinos que estaban junto a Jones, especialmente McNight, no pudieron identificar al acusado en la rueda de detenidos, se demuestra con claridad la falta de confiabilidad de la identificación hecha por Roa. Revocaría.